UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| THEODORE M COX, | ) | |
| | ) | C/A No.: 4:13-cv-1979-TER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CAROLYN W. COLVIN,[1] ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case is before the court pursuant to Local Rule 83.VII.02, D .S.C., concerning the disposition of Social Security cases in this District on consent of the parties. 28 U.S.C. § 636(c).

## I.  PROCEDURAL HISTORY

The Plaintiff filed an application for DIB alleging disability since July 7, 2010. A hearing was held by an Administrative Law Judge ("ALJ") on September 14, 2012. The ALJ found in a decision dated December 6, 2012, that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review. Plaintiff filed this action on July 18, 2013, in the United States District Court for the District of South Carolina.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

## II.  INTRODUCTORY FACTS

Plaintiff was born on January 9, 1966, and was 44 years old on the alleged disability onset date. (Tr. 27). Plaintiff has a high school education and past relevant work experience as an electrician. Plaintiff alleges disability due to various impairments including the effects of his status post cervical surgeries and left shoulder surgery, plantar fascial fibromas, cubital tunnel syndrome, medial epycondylitis, sensorineural hearing loss and vertigo, migraine headaches and degenerative disc disease of the lumbar spine.

## III.  THE ALJ'S DECISION

In the decision of December 6, 2012, the ALJ found the following:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.      The claimant has not engaged in substantial gainful activity since July 7, 2010, the alleged onset date (20 CFR 404.1571, *et seq*.).

3.      The claimant has the following severe impairments: status post cervical surgeries and left shoulder surgery (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a).  Specifically the claimant is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day and stand and walk for at least two hours in an eight-hour workday.  The claimant cannot climb, crawl, or balance.  The claimant should avoid exposure to hazards.  The claimant can perform no more than

2

frequent fingering with the nondominant hand and no overhead reaching with the nondominant arm.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January 9, 1966 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 7, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 20-29).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial

evidence and (2) whether the legal conclusions of the Commissioner are correct under controlling law.  Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978).  "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 390.  Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict.  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).   The Court's scope of review is specific and narrow.   It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence.   42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established.  Five questions are to be asked sequentially during the course of a disability determination.  20 C.F.R. §§ 404.1520, 1520a (1988).  An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  See 20 C.F.R. § 404.1505(a); Blalock,

4

483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R.

§ 404.1503(a). Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must

be upheld if supported by substantial evidence and proper legal standards were applied. Smith v.

Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if she can return to her past relevant

work as it is customarily performed in the economy or as the claimant actually performed the work.

SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning

of the Social Security Act. 42 U.S.C. § 423 (d)(5). She must make a prima facie showing of

disability by showing she was unable to return to her past relevant work. Grant v. Schweiker, 699

F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden

is on the Commissioner to come forward with evidence that the plaintiff can perform alternative

work and that such work exists in the regional economy. The Commissioner may carry the burden

of demonstrating the existence of jobs available in the national economy that the plaintiff can

perform despite the existence of impairments which prevent the return to past relevant work by

obtaining testimony from a vocational expert. Id. at 191.

## IV. ARGUMENTS

The Plaintiff argues that the ALJ erred in his decision. Specifically, Plaintiff raises the

following arguments in his brief, quoted verbatim:

> 1.  The ALJ's Finding That the Cervical Spine Surgeries and the
>     Left Shoulder Surgery Were the Only Severe Impairments at
>     Step Two of the Sequential Evaluation Was Legally

Erroneous and Was Not Supported by Substantial Evidence.

2.    The ALJ's Evaluation of the Medical Opinion Evidence and His RFC Findings Were Reached Through Misapplication of Controlling Legal Standards and Were Not Supported by Substantial Evidence.

3.    The ALJ Failed To Consider The Combined Effect of All of the Impairments.

4.    The ALJ Improperly Evaluated Cox's Credibility Concerning Allegations of Pain and Other Subjective Symptoms.

(Plaintiff's brief).

Plaintiff argues that the ALJ erred in finding that his plantar fascial fibromas, cubital tunnel syndrome and medial epycondylitis were not severe impairments. Plaintiff also asserts that the ALJ failed to make any step two findings with regard to Plaintiff's sensorineural hearing loss and vertigo, migraine headaches and degenerative disc disease of the lumbar spine. Plaintiff makes a related argument that the ALJ failed to specifically consider the combined effect of all of his medically determinable impairments . Additionally, Plaintiff asserts that the ALJ did not properly evaluate the medical opinion testimony or Plaintiff's credibility. Plaintiff argues that his case should be remanded for further proceedings. Defendant argues in response that the determination that Plaintiff was not disabled is supported by substantial evidence and is legally sound.

## V. MEDICAL RECORDS AND OPINIONS

On June 26, 2010, Plaintiff was jumping on a trampoline and dove head-first into a swimming pool, after which he felt a sudden onset of pain in his neck. He underwent evaluation where a CT scan showed fractures in his cervical vertebrae. He was placed in a Miami-J collar, sent home, and told to follow-up with Curtis Worthington, M.D., a neurologist. (Tr. 310-11). On July 26, 2010, Plaintiff underwent an anterior diskectomy with decompression of the spinal cord and

6

nerve roots at C5-C7 of the cervical spine, performed by Dr. Worthington. (Tr. 376.).

In September 2010, Plaintiff complained to Dr. Worthington of a "bee sting feeling" at the base of his neck, difficulty sleeping, and increased migraine headaches. X-rays of Plaintiff's neck looked good and he admitted to being clearly far better since his operation than before it. Dr. Worthington advised Plaintiff to not wear his collar anymore and recommended over-the counter pain medications. (Tr. 373).

Beginning in November 2010, Plaintiff also complained of pain in mid to lower back. (Tr. 372.). An MRI of Plaintiff's thoracic spine was unremarkable (Tr. 314) and an MRI of his lumbar spine showed minimal degenerative disc disease and facet arthropathy. (Tr. 315). Plaintiff reported continued left sided neck pain that radiated into his left shoulder, the lateral aspect of his left arm, and third, fourth, and fifth digits of the left hand. (Tr. 370-71, 334-37, 373-74, 427.). It was noted that the last two digits of his left hand were completely numb and had been that way since surgery. Id.

In December 2010, an MRI showed only mild abnormalities in Plaintiff's cervical spine. (Tr. 344-45). However, a CT scan of his neck showed that he had failure of bone fusion, anterolisthesis, and a "loose" screw. (Tr. 342-43). Four days later, Plaintiff complained to Adele Moore, a nurse practitioner, of left-sided neck pain radiating into his left shoulder, arm, and hand. He also reported numbness in his fingers. Ms. Moore found that he had weak triceps on the left and marked pain, particularly at night. Plaintiff complained that he could not lie on his side and heard a crunching noise when he turned his head one direction or another. Ms. Moore noted he continued to smoke cigarettes throughout his post-recovery period. She instructed him to wear his cervical collar again and stop smoking as no repair would be successful if he continued to smoke. (Tr. 370). Upon review

7

of Plaintiff's December 13, 2010 CT scan and MRI, Dr. Worthington concluded that Plaintiff's prior cervical fusion had failed at two levels and that Plaintiff needed to undergo a re-fusion. (Tr. 369.) Dr. Worthington attributed the failed fusion to Plaintiff's continued cigarette smoking during the post-recovery period. (Tr. 369.)

Plaintiff underwent revision neck surgery with Dr. Worthington and otolaryngologist, Michael C. Noone, M.D. on February 17, 2011. (Tr. 327.) The surgery included removal of the failed hardware, anterior decompression, and re-fusion. (Tr. 364-65.). Later that month, Plaintiff presented to Sarah Rogers, M.D., complaining of masses in the soles of his feet. He reported a past history of migraine headaches. Dr. Rogers found Plaintiff had a mass on the arch of his left foot and smaller mass on the sole of his right foot, but a normal gait. She diagnosed localized masses and recommended a left foot x-ray (Tr. 459-60), which was normal. (Tr. 451).

In March 2011, Dr. Worthington noted that Plaintiff was doing well, had not smoked, and was using a bone growth stimulator. He recommended that Plaintiff increase his physical activity and undergo physical therapy. (Tr. 394).

The following month, Plaintiff presented to the emergency room with complaints of a seizure. He reported he smoked cigarettes and used marijuana with his last use on the prior day. A CT scan of Plaintiff's head was normal. Generalized seizure of unknown cause was diagnosed, smoking cessation was recommended, and medications were prescribed. (Tr. 429-36, 444). Later that month, an MRI of Plaintiff's brain was normal (Tr. 382) and an x-ray of his neck showed intact orthopedic hardware and progressing fusion (Tr. 383).

On May 31, 2011, Plaintiff was discharged from the care of Dr. Worthington by certified nurse practitioner, Adele P. Moore, NP-C. (Tr. 392.) Ms. Moore indicated that Plaintiff's pain had

8

improved since the cervical spine revision fusion. (Tr. 392.) She also stated that the x-ray of Plaintiff's cervical spine taken the month before (Tr. 383) showed an excellent fusion in progress. (Tr. 392.) She instructed Plaintiff to continue with smoking cessation and to not do any heavy lifting. (Tr. 392.) Physical examination at the time of discharge revealed trigger point pain that radiated around the axilla (armpits) into Plaintiff's chest wall when she pressed on his shoulder blades. (Tr. 392.)

On July 20, 2011, family practitioner, Adebola Rojugbokan, M.D. conducted a consultative neurological examination (CE) of Plaintiff at the request of the state disability determination services (DDS). (Tr. 408, 411.) Dr. Rojugboken dictated two reports.  In the first report, Dr. Rojugbokan stated that, neurologically, Plaintiff had normal cerebellar and finger-to-nose testing and ability to use his fingers, hands, and arms for fine, gross, and dexterous movements. He had slightly diminished grip strength on the left, but full grip strength on the right, and no signs of disorganization of motor function in his arms or legs in the form of paresis or paralysis. He had no tremors or involuntary movements. He had decreased sensation to light touch on his face and arms, especially on the left. He had no abnormal motor movements, but slight muscular weakness, especially on the left arm. He could tandem walk and had normal rapid alternating hand motions. Dr. Rojugbokan noted Plaintiff limped, used a cane, and had slight ataxia. (Tr. 411-12.)

In the second report, it was noted that Plaintiff complained of neck pain radiating into his shoulder and back. Plaintiff stated he had difficulty performing any kind of work-related function because he could not stand for 30 minutes. Plaintiff stated he could sit for three hours. Plaintiff also stated that he could lift and carry about 10 pounds and could not normally handle objects. Plaintiff reported he smoked a half a pack of cigarettes per day for 30 years. Dr. Rojugbokan found Plaintiff

9

had grossly normal hearing. Neurologically, he had normal coordination, heel-toe walking, alternating hand motion, and gait and did not use any kind of assistive device. He also had intact sensation. Dr. Rojugbokan diagnosed broken neck, status post spinal cord damage, and status post-neck surgery and stated Plaintiff could walk, listen, see, hear, and reason. (Tr. 408-10).

On August 03, 2011, non-examining DDS medical consultant, Michael Perll, M.D. completed a Physical RFC Assessment form in which he expressed opinions about Plaintiff's physical limitations. (Tr. 414-20.).   Dr. Perll found Plaintiff capable of lifting ten pounds occasionally, sitting and standing six hours out of an eight-hour work day, and no overhead reaching bilaterally. (Tr. 415-16.).

In October 2011, Plaintiff complained of vertigo, ringing in his ears, hearing loss, nodules in his feet, and neck pain to Dr. Rogers. Dr. Rogers found Plaintiff had tender nodules in both feet and no ataxia. She diagnosed chronic pain, plantar fascial fibromatosis, and vertigo and prescribed medications. (Tr. 456-58).  Plaintiff was referred for further evaluation by an ears, nose, and throat (ENT) specialist or otolaryngologist; and was also referred for surgical consultation with orthopedic surgeon William S. Corey, M.D. in order to investigate the possibility of surgical removal of the plantar fascial fibromas on the soles of Plaintiff's feet. (Tr. 421-23.).

Dr. Corey's examination was conducted on November 7, 2011 and revealed that the fibromas were tender to palpation. (Tr. 422.) Dr. Corey ultimately recommended that Plaintiff try nonsteriodal anti-inflammatories and custom orthotics to treat the fibromas because surgery on the bottoms of the feet could cause a painful scar and the fibromas would often grow back, sometimes even larger. (Tr. 422-23.)

On November 8, 2011, Plaintiff was evaluated for vertigo by otolaryngologist Thomas S.

10

Dozier, M.D. (Tr. 424.) Dr. Dozier performed an audiogram and assessed Plaintiff as having high frequency sensorineural hearing loss and dizziness. (Tr. 425-26.).

On November 14, 2011, Plaintiff began treatment with board-certified physiatrist (physical medicine and rehabilitation specialist), Nancy Lembo, D.O. for the symptoms associated with the cervical spine impairment. (Tr. 470-71.) On initial physical examination Dr. Lembo found paraspinal tenderness, painful range of motion on extension, atrophy of the scapular muscles and biceps of the upper extremities, and mid-scapular winging. (Tr. 470.) She assessed his condition as status post anterior fusion at C5-6 and C6-7 and left upper extremity radiculopathy with dysthesias. (Tr. 471.) To help with the symptoms, she prescribed Neurontin and a trial of Fentanyl patches. (Tr. 471.).

On November 17, 2011, Plaintiff presented to John Lucas, M.D., with complaints of a seizure that month and the prior April. Dr. Lucas found Plaintiff had decreased neck ranges of motion and subtle left arm weakness, but normal sensation, coordination, stance, and gait (Tr. 452-53), findings he repeated in December 2011 (Tr. 480-81) and March 2012 (Tr. 477-79). Dr. Lucas diagnosed grand mal seizures. (Tr. 452-53).

An MRI conducted on December 1, 2011 was normal. (Tr. 483). An EMG nerve conduction study performed on December 12, 2011 showed Plaintiff had mild to moderate left cubital tunnel syndrome and chronic neck radiculopathy. (Tr. 499-502). Based on the results of this study, Dr. Lembo referred Plaintiff for a surgical evaluation with hand surgeon, Timothy G. Allen, M.D. (Tr. 473, 499.).

Also in December 2011, Angela Saito, M.D., a state agency physician, reviewed the evidence and found Plaintiff had functional abilities consistent with a range of sedentary work that did not require reaching overhead. She stated Plaintiff should avoid concentrated exposure to noise and all

exposure to hazards (machinery, heights, etc.) (Tr. 64-77). Later that month, an EEG was normal. (Tr. 482).

Dr. Allen conducted the surgical evaluation and reviewed Plaintiff's previous EMG/NCS on January 6, 2012. (Tr. 473-74.) On physical examination, Dr. Allen found that Plaintiff's left hand and wrist showed positive Tinel around the cubital tunnel at the elbows. (Tr. 473.) He also found that there was positive tenderness to palpation at the medial epicondyle that was exacerbated by wrist flexion and forearm pronation. (Tr. 473.) Thus, Dr. Allen concurred in the assessment of cubital tunnel syndrome and also assessed medial epicondylitis. (Tr. 473.) As a result of these findings, he recommended that Plaintiff undergo an ulnar nerve transposition and medial epicondylar release surgery. (Tr. 473-74.) Plaintiff was not medically cleared to undergo the surgery at the time of the hearing because Dr. Lucas was still evaluating Plaintiff's seizures. (Tr. 47, 477, 493, 511, 559.)

Also in January 2012, Plaintiff returned to Dr. Lembo who found that he had muscle tenderness and painful range of motion testing in his back, but no scapular winging or atrophy in his arms and full strength and normal sensation throughout (Tr. 495-97), findings she repeated over the next seven months visits. (Tr. 485-87, 489-94, 519-21, 523-25, 527-29, 556-60, 562-64). Dr. Lembo prescribed narcotic medications. (Tr. 495-97). On January 12, 2012, Plaintiff complained to Dr. Rogers of seizures, numbness and tingling to the third to fifth fingers of the left hand. He reported that he continued to smoke. (Tr. 509-511). Dr. Rogers found Plaintiff had a normal gait, a finding she repeated the following August (Tr. 578-80) and October (Tr. 566-68, 571-73). Dr. Rogers diagnosed stable grand mal seizures and mononuropathy. (Tr. 509-11). In August, she also diagnosed migraines. In October, she diagnosed vertigo as well. At the end of that month, a CT scan of Plaintiff's neck showed interval fusion with persistent subluxation (vertebral misalignment),

12

possible nonincorporation of the bone, and mild degenerative changes (Tr. 515-16).

The following month, Dr. Lembo diagnosed status post-anterior cervical fusion, chronic pain, myofascial pain, and ulnar neuropathy and prescribed muscle relaxant and narcotic medications. (Tr. 492-94).

In March 2012, Plaintiff complained to Dr. Lembo of neck pain radiating into his shoulder with numbness, tingling, and weakness that was somewhat controlled with medications. Dr. Lembo prescribed narcotic medication. (Tr. 489-91). Six days later, Plaintiff told Dr. Lucas he stopped taking Keppra (an anti-convulsant) due to side effects with no further seizures. He was frustrated that surgery for his ulnar nerve was on hold while trying to evaluate his seizures. (Tr. 477-79). On March 23, 2012, Dr. Lembo administered cervical facet joint injections. (Tr. 488, 554-55). One week later, Plaintiff reported improvement in his symptoms following these injections to Dr. Lembo, who prescribed medications, including steroids, narcotics, and medication for neurolytic pain. (Tr. 485-87).

The following month, Plaintiff reported his symptoms improved for three days following cervical facet injections. Dr. Lembo prescribed narcotic medications and sleep aids. (Tr. 527-29).

In May 2012, Dr. Lembo administered cervical medial branch block injections. (Tr. 526, 544-45). One week later, Plaintiff told Dr. Lembo that his symptoms improved completely for two days following these injections. Dr. Lembo prescribed narcotic and muscle relaxant medications and recommended further medial branch block injections (Tr. 523-25), which she administered one week later. (Tr. 522). A CT scan of Plaintiff's neck showed stable anterolisthesis. (Tr. 534).

The following month, Plaintiff told Dr. Lembo that his symptoms improved for three days following his prior medial branch block injections. Dr. Lembo prescribed narcotic and sleep aid

medications. (Tr. 519-21). Two weeks later, Plaintiff underwent cervical radiofrequency ablation. (Tr. 532, 565). On June 18, 2012, Dr. Lembo administered further cervical medial branch block injections. (Tr. 542-43). Eleven days later, Plaintiff reported to Dr. Lembo his head pain resolved with radiofrequency ablation, but he still had left arm and shoulder pain, which were controlled with medications. Dr. Lembo prescribed narcotic medications. (Tr. 562-64).

The following month, Dr. Lembo again administered cervical radiofrequency ablation. (Tr. 530). In August 2012, Dr. Lembo found Plaintiff had abnormal sensation on the left and she continued his narcotic and sleep aid medications. (Tr. 558-60). Plaintiff returned to Dr. Rogers with complaints of migraine headaches that began years prior and most recently the prior week. Plaintiff reported his seizures were stable, with his last seizure occurring the prior October. Plaintiff reported he started taking Depakote, but stopped after a month because he did not realize he had any refills available. He also reported he continued to smoke cigarettes. Dr. Rogers diagnosed stable grand mal seizures, classical migraine headaches, and irritability and prescribed medications (Tr. 578-80).

Later that month, Plaintiff returned to Dr. Lucas, reporting he quit taking Depakote after two months and just restarted. Plaintiff complained of headaches. He reported he smoked cigarettes. Dr. Lucas found Plaintiff had normal gait and muscle tone, bulk, and strength and intact sensation (Tr. 575-76), findings he repeated the following October (Tr. 569-70). Dr. Lucas diagnosed generalized convulsive epilepsy and personal history of noncompliance and prescribed anti-convulsant medication. (Tr. 575-76). Subsequent EEG studies were normal (Tr. 574, 577).

In September 2012, Plaintiff presented to the emergency room with complaints of a seizure. He described his seizures as well controlled, but stated he still had several seizures per year. Grand mal seizures were diagnosed and medications were administered (Tr. 593-607).

14

The following month, Plaintiff told Dr. Rogers he had three seizures the prior day. He stated he took Depakote, but was trying to stretch it out until he could get a refill. He reported having trouble getting his medications because his insurance would not pay for all of them. He complained of migraine headaches that began several years prior and most recently the prior week. He described them as stable and that he had four of them monthly for several hours. Plaintiff reported he continued to smoke cigarettes. Dr. Rogers instructed Plaintiff to take Depakote every day as prescribed (Tr. 571-73). Plaintiff returned to Dr. Lucas the following day, reporting he still smoked cigarettes. Dr. Lucas noted that, when Plaintiff took his medications, he had no seizures, and told Plaintiff he would not treat him anymore if he did not take his medications. He also instructed Plaintiff to stop smoking. (Tr. 569-70).

The following week, Plaintiff complained to Dr. Rogers of vertigo, loss of balance, and anxiety. Dr. Rogers diagnosed worsening vertigo and prescribed medications (Tr. 566-68). One week later, an MRI of Plaintiff's brain showed no abnormalities. (Tr. 582).

On October 22, 2012, Plaintiff presented to the emergency room with complaints of a seizure. Generalized seizure and sub-therapeutic Depakote were diagnosed and medications were prescribed. (Tr. 584-92).

Three days later, Barry Weissglass, M.D., examined Plaintiff at the request of his attorney. Plaintiff complained of a history of seizures once every one to two weeks; neck problems; cubital tunnel syndrome; plantar fascia fibromas; low back pain; high frequency hearing loss with dizziness and vertigo; rotator cuff injury; and migraine headaches approximately every week or two which lasted for varying amounts of time and made it impossible for him to do anything. Plaintiff reported he spent his days watching television and taking short walks. He reported he smoked cigarettes until

15

the prior month and smoked marijuana until November 2011. Dr. Weissglass found Plaintiff had a moderately antalgic gait leaning forward to the right and required some assistance getting on and off the examination table and even out of his chair. He had decreased sensation along his left third through fifth fingers and decreased sensation to touch in his right hand, but normal motor functioning and coordination. He had pain in his left elbow; large tender masses in his feet; mild to moderate tenderness in his left hand; some discomfort with seated leg extension; and mild back tenderness with no spasms. He had neck pain without spasms. (Tr. 608-13).

Dr. Weissglass stated that Plaintiff could only lift 10 pounds, bend at the waist only occasionally, and stand and/or walk for less than two hours in an eight-hour workday. He stated Plaintiff had no limitations in his right arm, but could not use his left arm above shoulder level. He stated Plaintiff could sit for less than two hours in an eight-hour workday. He reported that Plaintiff needed to change positions every 15 to 20 minutes; take unscheduled breaks every 30 to 45 minutes; and alternate between sitting and standing every 20 to 30 minutes. He also reported that Plaintiff could only move or position his neck occasionally. He stated that Plaintiff could continuously reach with his right arm, and occasionally reach with his left arm (but never above shoulder height). He stated Plaintiff could constantly handle with his right arm, but only occasionally handle with his left arm and finger with both hands. He also stated Plaintiff should avoid heights, hazards, and moving machinery. He further stated that Plaintiff would experience limitations in concentration and attention for 50 percent or more of a workday or workweek and would miss work four or more days per month. He opined that Plaintiff could not sustain any type of work and his impairments were permanent and not expected to improve. (Tr. 614-22).

At the administrative hearing, Plaintiff testified that he had severe chronic pain in the left side

16

of his neck, his left shoulder, extending down through his elbow and the left three fingers of his hand. (Tr. 43-44). He testified that he had some tingling and numbness in the fingers and his grip was not as strong as it used to be. (Tr. 44). He testified that he had pain in the center of his back that extended into his left leg. (Tr. 45). Plaintiff testified that he had migraine headaches one or twice a week which completely incapacitated him. Id. Plaintiff also testified that he has had three grand mal seizures as well as a number of acute seizures. (Tr. 46). Plaintiff indicated that he suffers from severe vertigo and tinnitus. (Tr. 48). He stated that his doctor advised him not to lift more than five pounds or a gallon of milk. He testified that he had fairly good reaching ability with his right arm, but difficulty lifting with the left arm (Tr. 48). He noted that he had difficulty sitting for extended periods and would prop up his feet (Tr. 52). He further reported difficulty with walking for long distances due to the tumors on the bottom of his feet. (Tr. 51). He also stated his medications made him dizzy and nauseated (Tr. 50).

## VI. DISCUSSION AND ANALYSIS

The ALJ found that Plaintiff suffered from the severe impairments of status post cervical surgeries and left shoulder surgery. (Tr. 22) The ALJ found that Plaintiff's seizures, plantar fascial fibisromas and ulnar nerve entrapment at the elbow were non severe impairments. (Tr. 22-23) The ALJ concluded that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (Tr. 23). He then considered Plaintiff's RFC and found that although Plaintiff could not perform his past relevant work as an electrician, there were jobs existing in significant numbers in the national economy that Plaintiff could perform, concluding that Plaintiff was not disabled. (Tr. 24–29).

Plaintiff's initial argument is that the ALJ erred by finding that only Plaintiff's status post

cervical surgeries and left should surgery were severe impairments. Plaintiff asserts that the ALJ erroneously found that Plaintiff's plantar fascial fibisromas, cubital tunnel syndrome, and medial epycondylitis were not severe. Additionally, Plaintiff argues that the ALJ failed to make any step two findings with regard to Plaintiff's sensorineural hearing loss and vertigo, migraine headaches, and degenerative disc disease of the lumbar spine. On a related note, Plaintiff argues that the ALJ failed to consider all of his impairments in combination. (Plaintiff's Brief). The Commissioner asserts that the ALJ reasonably found that Plaintiff's severe impairments included only the status post cervical surgeries and left shoulder surgery, and that any arguable deficiency in addressing other impairments does not amount to reversible error.

Step Two of the sequential evaluation requires the ALJ to "consider the medical severity of [a claimant's] impairment(s)." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The claimant bears the burden at this step to show that she has a severe impairment. See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" means "the abilities and aptitudes necessary to do most jobs." Examples of these include:

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2)    Capacities for seeing, hearing, and speaking;
(3)    Understanding, carrying out, and remembering simple instructions;
(4)    Use of judgment;
(5)    Responding appropriately to supervision, co-workers and usual work situations; and
(6)    Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b). "[A]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be

expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir.1984) (emphasis in original) (internal quotation marks omitted).

As to Plaintiff's Cubital Tunnel Syndrome and Medial Epicondylitis, the Plaintiff argues that the ALJ erroneously concluded that Plaintiff's ulnar nerve entrapment at the elbow, or cubital tunnel syndrome of the left arm was not severe at step two. The ALJ made no mention of Plaintiff's medial epicondylitis of the left elbow. (Tr. 23.) In reaching his finding that the ulnar nerve entrapment was not severe, the ALJ stated that the record did not reflect that Plaintiff underwent surgery for this condition and that the his muscle strength was unaffected. (Tr. 23.).

Plaintiff notes that Dr. Lembo ordered an EMG/NCS study that was performed on December 12, 2011, and which showed multiple positive findings that confirmed the diagnosis of chronic left C5 and C6 radiculopathy and cubital tunnel syndrome. (Tr. 499.) Dr. Allen  confirmed that the EMG/NCS findings showing cubital tunnel syndrome and also diagnosed medial epycondylitis of the left elbow. (Tr. 473.) On physical examination, Dr. Allen found positive Tinel sign around the cubital tunnel at the elbow, positive tenderness to palpation of the medial epicondyle, symptom aggravation with wrist flexion and forearm pronation, and reduced muscle strength (4+/5) in both arms in the first dorsal interosseous muscle. (Tr. 473.).   Dr. Allen recommended cubital tunnel release surgery based on these findings (Tr. 473-74) but Plaintiff was never medically cleared to undergo the surgery by Dr. Lucas, his treating neurologist, because Dr. Lucas was still evaluating Plaintiff's seizure disorder. (Tr. 47, 477, 493, 559.) The Plaintiff asserts that it was error for the ALJ to conclude that lack of surgery supported a conclusion that these conditions were not severe. See SSR 86-8 (Reasonable inferences may be drawn, but presumptions, speculations and suppositions

should not be substituted for evidence.); Cf. 20 C.F.R. 404.1530 (requiring ALJ to consider any justifiable cause before concluding that a claimant failed to follow prescribed treatment); SSR 82-59 (same); Preston v. Heckler, 769 F.2d 988, 990-91 (4th Cir. 1985) (stating noncompliance requires a particularized inquiry, which the ALJ bears the burden of proving).

Plaintiff also asserts that there is evidence that Plaintiff demonstrated decreased muscle strength and grip strength of the left extremity on physical examination, (Tr. 44, 473, 547) was found to have muscle atrophy in the biceps of the upper extremities (Tr. 470), and muscular weakness in the left arm. (Tr. 411.). Plaintiff argues that there was also evidence that these conditions negatively impacted Plaintiff's ability to engage in activities requiring the use of the hands for fine and gross manipulation and that pain adversely affected his ability to concentrate (Tr. 49, 52, 612, 619-21.) such that the the ALJ erred by not considering whether these impairments caused any significant non-exertional limitations in handling and fingering (manipulative limitations) or in sustained concentration and attention (mental limitations). See 20 C.F.R. § 404.1569(c); SSR 96-8p, SSR 96-9p; See Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989) (stating that a non-exertional impairment is significant when it affects an individual residual functional capacity to perform work of which he is exertionally capable).

With regards to Plaintiff's claimed vertigo and hearing loss, Plaintiff also argues that the evidence shows that he experienced a return of intermittent episodes of vertigo beginning in October 2011 (Tr. 456-57) and the vertigo continued to cause problems through the date of the hearing (Tr. 566-67). The clinical evaluation and audiogram Dr. Dozier performed in November 2011 confirmed high frequency sensorineural hearing loss and dizziness. (Tr. 425-26). Plaintiff asserts that the ALJ's failure to consider this impairment in the decision constituted reversible error. See SSR 96-8p;

SSR 96-3p; SSR 85-28.

As to his claimed degenerative disc disease of the lumbar spine, Plaintiff testified at the hearing that he experienced severe pain in the center of his back (Tr. 42) with pain that radiated down his left leg (Tr. 45) which contributed to his difficulty walking. (Tr. 51.) Plaintiff also indicated had a difficult time sitting in a chair for extended periods. (Tr. 52, 609, 617.) A MRI of the lumbar spine from November 2010 revealed mild degenerative disc disease and facet arthropathy. (Tr. 315.). Yet, the ALJ failed to address Plaintiff's degenerative disc disease of the lumbar spine and complaints of pain in the lower back in the decision. See SSR 96-8p; SSR 96-3p; SSR 85-28.

Concerning Plaintiff's claimed migraine headaches, Plaintiff testified at the hearing that migraine headaches were one of the residual problems from his electrocution injury in 1995. (Tr. 42.) He also testified that he experienced increased migraine headaches after a chiropractor manipulated his neck in June 2012 on referral from Dr. Lembo. (Tr. 45, 564). The migraine headaches occurred at least once a week and lasted from three to six hours and sometimes occurred back-to-back. (Tr. 45.) Plaintiff indicated that he was unable to perform normal activities and was completely incapacitated while experiencing these headaches. (Tr. 45, 53). Dr. Rogers medical records confirm that, beginning around August 2012, Cox started to experience bad migraine headaches up to four times a month that could last for hours at a time. (Tr. 571-72, 578-79.) Dr. Rogers also prescribed medications to treat the migraine headaches (Tr. 579), but Plaintiff's insurance refused to pay for the prescription. (Tr. 572). The ALJ did not address Plainitff's migraine headaches in the decision. See SSR 96-8p; SSR 96-3p; SSR 85-28.

Finally, with regards to Plaintiff's bilateral plantar facial fibromas Plaintiff testified at the hearing that he had tumors on the bottoms of his feet and that these made it difficult for him to walk

21

any long distances. (Tr. 45, 51.) Records show that Plaintiff sought treatment for this condition (Tr. 459-60) and that it was uncontrolled by October 2011. (Tr. 456-67.) On surgical consultation, Dr. Corey, M.D. found that the fibromas were tender to palpation, and he recommended a trial of custom orthotics and non-steroidal anti-inflammatories. (Tr. 422-23.) He recommended against surgery because it was often unsuccessful in effectively treating the condition and could cause residual problems due to scarring. (Tr. 422-23.) When Dr. Weissglass conducted an independent medical evaluation in October 2012, he found that there were large tender masses of approximately 3-4 cm in length and 2 cm in width along the mid medial border of the arches. (Tr. 612.). Plaintiff argues that the ALJ's findings with respect to the severity of Plaintiff's plantar fascial fibromas were not supported by substantial evidence.

After careful review and consideration, the Court concludes that the ALJ erred in his step 2 analysis. Specifically, the Court finds that the ALJ's determination that Plaintiff's seizures, plantar fascial fibisromas and ulnar nerve entrapment are not severe impairments is not supported by substantial evidence. In support of his allegations of error, Plaintiff points to records during and around the relevant time period concerning the impairments as issue that would arguably demonstrate that the impairments significantly limit his physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c). Moreover, the remainder of the decision does not appear to discuss these impairments or their possible limitations in combination with each other or the noted severe impairments. Additionally, the ALJ erred by not addressing Plaintiff's sensorineural hearing loss and vertigo, migraine headaches, and degenerative disc disease of the lumbar spine. Not only did the ALJ not find these complaints to be "severe impairments," he did not mention them at all in his decision. As the ALJ did not mention these impairments at all in his

22

decision, it is impossible to determine whether the ALJ actually considered these impairments and dismissed them as non-severe, or in the alternative simply was not aware of the medical evidence concerning these impairments when issuing his decision. Although the substantial evidence standard of review requires the court to uphold the ALJ's disability determinations when supported by substantial evidence, the court cannot conduct the review when it is unable to determine how the ALJ viewed particular evidence. See Gordon v. Schweiker, 725 F.2d 231 (4th Cir.1984). In this case, Plaintiff had complaints related to sensorineural hearing loss and vertigo, migraine headaches, and degenerative disc disease of the lumbar spine which are documented in the medical records. Yet, review of the ALJ's decision makes no mention of these complaints.

In his step two analysis, the ALJ finds Plaintiff has the severe impairments of status post cervical surgeries and left shoulder surgery. He then briefly discusses some of Plaintiff's seizure activity, his plantar fascial fibisromas and ulnar fibromyalgia. In his discussion of his step two findings, though, he never mentions Plaintiff's claimed sensorineural hearing loss and vertigo, migraine headaches, and degenerative disc disease of the lumbar spine. The ALJ's failure to cite specifically to any of these three claimed impairments makes it impossible to confirm that he considered these complaints, or the doctors' notes regarding these complaints or diagnoses, in reaching his conclusions. Additionally, not only did the ALJ not acknowledge that Plaintiff had these three complaints at step two in deciding whether they were severe impairments, he also did not consider them at step four in determining whether they impacted Plaintiff's RFC. The court does not find this error to be harmless. The court agrees with Plaintiff that the ALJ erred and that the matter should be remanded for full discussion of each of Plaintiff's complaints and the ALJ's determinations regarding whether each impairment is "severe" and to discuss the impact of each impairment on

23

Plaintiff's RFC. See Hurtado v. Astrue, 2010 WL 3258272 (D. S.C. 2014)(remanding case for ALJ to consider impairments of rheumatoid arthritis and carpal tunnel syndrome which were not discussed at all in the ALJ's decision);  Aurand v. Astrue, 07–3968–HMH, 2009 WL 364389 (Feb. 12, 2009) (remanding, inter alia, ALJ had not discussed one of plaintiff's claimed impairments); see also,  Bourgeois v. Astrue, 6:08–2608–SB, 2009 WL 2351743 (D.S.C. July 29, 2009) (remanding to require ALJ to consider diagnosis not discussed at step two and to consider all severe and nonsevere impairments in combination).

Relatedly, Plaintiff argues that, by not discussing her claims of sensorineural hearing loss and vertigo, migraine headaches, and degenerative disc disease of the lumbar spine in the decision at all, the ALJ did not appropriately consider all of her impairments in combination. The Commissioner again counters that the ALJ reasonably considered Plaintiff's impairments in combination.

The statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir.1989); Rabon v. Astrue, 4:08–3442–GRA, 2010 WL 923857 (D.S.C. Mar.9, 2010) (requiring remand when ALJ did not consider severe and nonsevere impairments in combination). Even if the claimant's impairment or impairments in and of themselves are not "listed impairments," the Commissioner must also "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." Walker, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Id.

24

The Commissioner's duty to consider the combined effect of Plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability process." 20 C.F.R. § 404.1523. Here, the ALJ failed to consider or, at least failed to articulate whether and how he considered, all of Plaintiff's impairments together, thereby violating 20 C.F.R. § 404.1523, which provides as follows:

> Multiple Impairments. In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

Id.; see also Fleming v. Barnhart, 284 F.Supp.2d 256, 270 (D.Md.2003) ( "The ALJ is required to assess the combined effect of a claimant's impairments throughout the five-step analytical process.")

The ALJ's preliminary discussion of the step-by-step analysis he is to undertake correctly indicates that he is to determine whether a claimant has an impairment or combination of impairments that is "severe" and that he is to consider "all of the claimant's impairments, including impairments that are not severe" in determining a claimant's RFC. (Tr. 21) (setting out his responsibilities under steps two and four). However, as discussed above, by not referencing Plaintiff's claimed impairments of sensorineural hearing loss and vertigo, migraine headaches, and degenerative disc disease of the lumbar spine, it is impossible to tell that the ALJ considered all of the claimant's impairments and whether they were severe. Further, nowhere in his analysis of Plaintiff's RFC does he indicate that he considered sensorineural hearing loss and vertigo, migraine headaches, and degenerative disc disease of the lumbar spine at all, nor does he adequately indicate that he considered all of Plaintiff's severe and nonsevere impairments in combination. The ALJ's

declaration that "the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526)[,]" (Tr. 17), is insufficient under the law. See Walker, 889 F.2d at 50 (such a "finding in itself, however, is not sufficient to foreclose disability.")

Based on the foregoing, the court is constrained to remand this matter for further consideration of Plaintiff's impairments at step two, and the impact on the remaining sequential process. Accordingly, this case is remanded to the ALJ so that he can examine Plaintiff's claimed impairments of seizures, sensorineural hearing loss and vertigo, migraine headaches, and degenerative disc disease of the lumbar spine and expressly determine whether he finds either of these to be "severe" impairments. Then, regardless of whether he finds them to be severe or nonsevere, the ALJ should be instructed to consider the combined effect of all of Plaintiff's impairments, severe and non-severe, and, in the decision on remand, explain his evaluation of the combined effect of Plaintiff's multiple impairments.

Furthermore, because this matter is remanded for further consideration, the court need not address Plaintiff's remaining issues, as they may be rendered moot on remand. See Boone v. Barnhart, 353 F.3d 203, 211 n. 19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the Commissioner should take into consideration Plaintiff's remaining allegations of error, specifically, whether the ALJ properly evaluated the medical opinion evidence in the case, whether the ALJ properly evaluated Plaintiff's credibility, and whether the ALJ properly considered evidence or made any necessary findings of fact related to absenteeism.

26

## VII.  CONCLUSION

Accordingly, pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631 (c) (3) of the Social Security Act, 42 U.S.C. Sections 405 (g) and 1338 (c) (3), it is,

**ORDERED** that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be **REMANDED** to the Commissioner for further administrative action as set out above.

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

September 17, 2014
Florence, South Carolina